UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENNI VALDEZ,

Petitioner,

-v.-

ECKERT STEWART,

Respondent.

17 Civ. 4121 (KPF) (SLC)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

Petitioner Denni Valdez filed a *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (the "Petition") against Superintendent Eckert Stewart of the Wende Correctional Facility in Alden, New York. Valdez's Petition seeks review of his New York State Supreme Court conviction for second degree murder, a charge to which he pleaded guilty in 2012. Counsel has been appointed to assist Valdez with this action.

Magistrate Judge Sarah L. Cave issued a Report and Recommendation on December 20, 2019 (the "Report" (Dkt. #27), attached), recommending that the Petition be dismissed in its entirety. Valdez filed his objection to the Report on February 17, 2020 (the "Objection" (Dkt. #30)). The Court has examined both Judge Cave's comprehensive Report and Valdez's Objection, and, for the reasons set forth below, adopts the Report in full. Accordingly, the Petition is denied.

## BACKGROUND[1]

The facts and procedural history underlying this action are set forth in the Report, and the Court assumes familiarity with them. Therefore, the

---

[1]     This Opinion primarily draws on facts and arguments presented in Valdez's Petition (Dkt. #1), Judge Cave's Report (Dkt. #27), and Valdez's Objection (Dkt. #30).

Court here provides only a brief summary relevant to resolving Valdez's Objection to the Report.

## A.    Factual Background

On May 11, 2011, a grand jury indicted Valdez on one count of murder in the second degree for causing the death of Joshua Nelson, in violation of New York Penal Law § 125.25(1), and one count of criminal possession of a weapon in the second degree, in violation of New York Penal Law § 265.03(3). (Dkt. #10-1, Ex. A; Report 3). The charges arose from an incident on April 12, 2011, when Valdez approached an unarmed Nelson from behind, shot him in the chest and leg, fled the scene, removed the hooded sweatshirt he had been wearing, and hid the gun in another person's apartment. (Report 2). Valdez was arrested later that day, at which time the police executed search warrants on his apartment in a residence for people with disabilities, as well as the apartment of a neighbor and friend, in the course of which they recovered a loaded revolver with three spent rounds and Valdez's hooded sweatshirt. (*Id.*).

## B.    The State Court Proceedings

### 1.    The Competency Hearings

Following Valdez's arraignment, his counsel gave notice of his intent to proffer psychiatric evidence under New York Criminal Procedure Law § 250.10(2), arguing that Valdez was "profoundly delayed, with an I.Q. of under 70," was in special education throughout his youth, and depended on the "continual care of clinicians and social workers" to function in society. (Dkt. #10-1, Ex. B; Report 3). As a result of his cognitive impairments, his counsel argued, Valdez was not criminally responsible for his actions on the

day of the murder, or, in the alternative, "acted under the influence of extreme emotional disturbance."  (Dkt. #10-1, Ex. B; Report 3).  Based on this assertion, Justice Carol Berkman of the New York State Supreme Court ordered an examination to assess Valdez's mental competence to participate in the criminal proceedings against him pursuant to New York Criminal Procedure Law Article 730 ("Article 730").  (Dkt. 10-2, Ex. H; Report 3).

The initial Article 730 hearing to assess Valdez's mental competence took place in March 2012 (the "First 730 Hearing").  (Dkt. #16-1 through 16-4 ("First 730 Hearing Transcripts"); Report 3).  The defense presented reports and testimony from two experts: Dr. Jennifer Rosner and Dr. Myles Schneider, a psychologist and psychiatrist at Bellevue Hospital, respectively. (Dkt. #10-1, Ex. D-E; *see generally* First 730 Hearing Transcripts; Report 4). Both had examined Valdez's educational and medical records and evaluated him in person on December 29, 2011.  (Report 4).  The parties stipulated to the entry of their reports, in which the experts identified Valdez's "Extremely Low" I.Q. score of 59, his classification as "Educable Mentally Retarded" at a young age, and at least two incidents where Valdez had sustained head trauma.  (*Id.* at 4-5).  Both experts concluded that Valdez was not fit to proceed due to his incapacity to cooperate rationally in his defense and his difficulty learning and retaining information about relevant legal concepts and courtroom proceedings.  (*Id.*).

At the First 730 Hearing, both experts conceded that they had not spoken with Valdez's friends, girlfriend, relatives, treating physicians, or other acquaintances.  (Report 5-6).  The prosecution demonstrated that one or both of the experts were unaware of or did not closely examine the facts

that Valdez, *inter alia,* was a registered voter; maintained three bank accounts; successfully applied for and renewed his identification card from the Department of Motor Vehicles; maintained email and social media accounts; and previously pleaded guilty to a past violation and misdemeanor.  (*Id.*).  Dr. Rosner acknowledged that she would have taken these facts into account in her analysis of Valdez's fitness for trial, while Dr. Schneider testified that he felt "less confident" of Valdez's incapacity with this newfound knowledge.  (*Id.*).

Justice Berkman noted that both experts had admitted that they were "misinformed" in some respects and "uninformed" in other respects concerning Valdez's background, and that this could have affected their competence determination.  (Report 7).  The court therefore ordered new examinations by both Dr. Rosner and Dr. Schneider, which examinations took place on April 19, 2012.  (*See* Dkt. #10-1 at 49-68; Dkt. #10-2 at 1; Dkt. #16-5 at 5, 8; Report 7).

On May 8, 2012, Justice Berkman conducted a second hearing to assess Valdez's mental fitness (the "Second 730 Hearing").  (Dkt. #16-5, 16-6 ("Second 730 Hearing Transcripts"); Report 7-9).  The defense presented new reports and testimony from Dr. Rosner and Dr. Schneider.  After reviewing the supplemental materials, such as Valdez's arrest records, social media posts and emails, DMV records, voter registration, bank records, housing and case management records from his rehabilitation center, and prison health records, Dr. Rosner concluded that despite his intellectual limitations, Valdez had a sufficient understanding of the charges against him and was fit to proceed.  (Report 7-8).  After reviewing the same materials

4

and interviewing Valdez's social worker, Dr. Schneider also concluded that Valdez had the capacity to understand the charges against him and the nature of the legal proceedings, and to cooperate in his defense; therefore, he was fit to proceed with the criminal case. (*Id.* at 8-9). After hearing testimony and further argument from counsel, Justice Berkman determined, consistent with both experts' ultimate conclusions, that Valdez was in fact fit to continue with the proceedings against him. (*Id.* at 9).

### 2.   The Guilty Plea and Sentencing

On June 27, 2012, Valdez withdrew his previously entered plea of not guilty and entered a plea of guilty to second degree murder. (Dkt. #16-6 at 26-42 (transcript)). During the plea proceeding, Justice Berkman and Valdez engaged in a lengthy colloquy to ensure that Valdez understood the meaning and consequences of his guilty plea. (*See* Report 10-17).

On July 19, 2012, Justice Berkman held a sentencing hearing during which Nelson's father and girlfriend gave victim impact statements, and Valdez apologized for his conduct. (Dkt. #16-7 (transcript)). Justice Berkman pronounced a sentence of 18 years' to life imprisonment and recommended psychiatric counseling. (*Id.*; Report 17).

### 3.   The Direct Appeal

Valdez, through counsel, appealed his conviction and sentence to the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, raising two issues: (i) his guilty plea was not knowing, intelligent, and voluntary, and (ii) his sentence was excessive. (Petition 2, 4; Report 17). The First Department affirmed his conviction, holding that Valdez had failed to preserve any challenge to his guilty plea, and, in the

5

alternative, that his plea had been knowing, intelligent, and voluntary. (Report 17 (citing *People* v. *Valdez*, 138 A.D.3d 464 (1st Dep't 2016))).  In the First Department's view, during the plea colloquy, "whenever [Valdez] made a statement that could be viewed as negating an element of the crime or raising a defense, the [trial] court asked clarifying questions that ensured that the allocution ultimately cast no doubt on [his] guilt or the voluntariness of his plea." (*Id.*).  The First Department further noted that, following the "extensive" Article 730 proceedings, the trial court found that Valdez was competent, and "there was nothing to warrant an inquiry into whether [his] mental condition impaired his ability to understand the proceedings, or into whether he waived any potential psychiatric defenses." (*Id.*).  The First Department also rejected Valdez's state-law challenge to his sentence.  (*Id.*).  On July 7, 2016, the New York Court of Appeals denied leave to appeal.  (Petition 2, 15; Dkt. #10-3; Report 18).

C.     **The *Habeas Corpus* Petition**

Valdez filed the instant Petition for *habeas corpus* relief, pursuant to 28 U.S.C. § 2254, on May 31, 2017, challenging his conviction on the ground that his guilty plea was unlawfully induced and not knowing and voluntary.  (Dkt. #1).  On June 2, 2017, this Court referred Valdez's Petition to Magistrate Judge Henry B. Pitman for a report and recommendation. (Dkt. #2).  Respondent opposed the Petition, arguing that Valdez's challenge to his guilty plea was procedurally defaulted, or, in the alternative, failed on the merits.  (Dkt. #11).  Although Valdez's Petition did not challenge his sentence (*see* Petition 4), Respondent's opposition also set forth arguments

6

why that claim was not cognizable on *habeas* review and why Valdez's sentence was fair and reasonable in any event (Dkt. #11; Report 18).

On October 20, 2017, Valdez moved for the appointment of counsel, on the grounds that he is "a mental health patient with a[n] MHU Level 2 status, presently prescribed with MHU medication, mentally retarded, illiterate, and destitute." (Dkt. #13; Report 18). On May 30, 2018, Valdez submitted a *pro se* reply to Respondent's opposition, in which reply he argued that his procedural default should be excused and that his plea was defective because he had asserted a justification defense. (Dkt. #20). Valdez conceded that his excessive sentence claim was not cognizable on *habeas* review, but argued that the Court should review the claim nonetheless because the state courts had unreasonably applied federal law. (*Id.*).

On September 14, 2018, Judge Pitman granted Valdez's motion for appointment of counsel. (Dkt. #23). Thereafter, Jeffrey G. Pittell, Esq., entered an appearance on behalf of Valdez. (Dkt. #24).[2] On April 22, 2019, Valdez, through counsel, submitted a Supplemental Memorandum of Law in Further Support of the Petition, arguing that (i) his challenge to his guilty plea was not procedurally defaulted, or in the alternative that the Petition should be stayed while he moved to vacate his plea in New York State court, and (ii) the First Department had unreasonably applied the law and unreasonably determined the facts in affirming his conviction. (Dkt. #26).

---

[2]     The Court takes this opportunity to extend its appreciation to Mr. Pittell for his work on this case.

**D.     The Report and Recommendation**

On October 3, 2019, the case was reassigned to Magistrate Judge Sarah L. Cave.  (Minute Entry for October 13, 2019).  Judge Cave issued the Report on December 20, 2019, recommending that Valdez's Petition be denied in its entirety.  (Dkt. #27).

Judge Cave began by addressing Valdez's challenge to his guilty plea, which Valdez claimed had been unlawfully induced and not made voluntarily and knowingly.  (Report 23).  Valdez specifically argued that the trial court failed to take the "utmost care" and use "simple language" with him, and that he "made several statements during the plea colloquy that either brought into doubt an element of the offense to which he was pleading or that tended to indicate his plea was not knowing, intelligent, and voluntary."  (Petition 4; Report 23-24).

Valdez raised his claim on direct appeal to the First Department and in his request for leave to appeal to the Court of Appeals, which steps would normally satisfy exhaustion requirements for federal court review.  (Report 24 (citing *Galdamez* v. *Keane*, 394 F.3d 68, 74 (2d Cir. 2005))).  However, as Judge Cave noted, the First Department expressly found that Valdez had failed to preserve his challenge to the voluntariness of his plea by failing to move to withdraw the plea or to vacate his conviction under New York Criminal Procedure Law § 440.10, and thus was not entitled to appellate review.  (*Id.* at 24-25).  Valdez argued that his claim was not procedurally barred because it was one of the "exceptional cases in which exorbitant application of [a] generally sound rule renders the state ground inadequate

8

to stop consideration of a federal question." (Report 25 (quoting *Lee* v. *Kemna*, 534 U.S. 362, 376 (2002))).

While Judge Cave was unpersuaded by Valdez's excuse for his procedural default, she did not dismiss the Petition based on procedural default alone and instead proceeded to analyze the merits of Valdez's claim. (Report 26). She pointed to *People* v. *Lopez*, 71 N.Y.2d 662 (1988), upon which Valdez relied for the proposition that a failure to make a motion to withdraw a guilty plea does not bar appellate review where "a defendant's factual recitation negates an essential element of the crime pleaded to" and the trial court fails to inquire further "to ensure that defendant understands the nature of the charge and that the plea is intelligently entered." (Report 26 (citing *Lopez*, 71 N.Y.2d at 666)).

Judge Cave explained, however, that determining whether the state procedural default bar applies inexorably requires an analysis of the merits of Valdez's claim, including assessment of whether his statements negated an essential element of the second degree murder charge and whether the trial court's subsequent inquiries were sufficient to ensure that his plea was knowing and voluntary. (Report 26 (citing *Lopez*, 71 N.Y.2d at 666)). Thus, Judge Cave adopted an approach similar to that of the First Department and proceeded to analyze the merits of Valdez's Petition, despite the possible independent and adequate state procedural ground barring relief. (*Id.*).

In assessing the voluntariness of Valdez's guilty plea, Judge Cave noted how Valdez's admission of guilt at the plea allocution was given a "strong presumption of verity" and "constitute[d] a formidable barrier in any subsequent collateral proceedings." (Report 27 (citing *Blackledge* v. *Allison*,

431 U.S. 63, 74 (1977); *United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997))).  A petitioner has the burden of "'rebutting the presumption of correctness by clear and convincing evidence.'" (*Id.* (citing *Murray* v. *McGinnis*, No. 00 Civ. 3510 (RWS), 2001 WL 26213, at *4 (S.D.N.Y. Jan. 10, 2001))).

In his Petition, Valdez argued that he was entitled to *habeas* relief under sections 2254(d)(1) and 2254(d)(2) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  (Report 27).  With respect to section 2254(d)(1), Valdez argued that, although the First Department had identified the correct governing federal legal principle, *i.e.*, whether Valdez's plea was knowing, intelligent, and voluntary, it had unreasonably applied that principle when it concluded that there was "nothing to warrant an inquiry into … whether [Valdez] waived any potential psychiatric defenses."  (*Id.*). Valdez claimed this application of federal law was unreasonable because, despite support in the record for potential affirmative defenses, including diminished capacity, mental disease or defect, lack of intent, and justification, Justice Berkman failed in her obligation to inquire whether Valdez understood that he was waiving his right to assert these defenses at trial.  (*Id.* at 27-28).

Judge Cave explained in the Report that while Valdez was correct that the circumstances relevant to the validity of his plea included the potentially available affirmative defenses, the record reflected that those defenses were adequately covered in the allocution.  (Report 28).  Justice Berkman specifically recessed to allow Valdez to consult with his counsel, after which his counsel represented to the trial court that he had "explored" with Valdez

10

"all possible defenses and [came] to a conclusion that this is the best resolution of this matter," and that Valdez was prepared to plead guilty to second degree murder. (*Id.*). Thus, in Judge Cave's view, the totality of the circumstances demonstrated that before accepting the guilty plea, the trial court conducted the requisite "detailed inquiry" and "ascertained that [Valdez] understood the consequences of the plea and that he wished to plead guilty." (*Id.* at 29 (quoting *Murray*, 2001 WL 26213, at *5)).

Further, Valdez was represented by competent counsel, with whom he consulted before and during the colloquy, a fact that "weighs heavily toward a finding of voluntariness." (Report 29 (citing *Murray*, 2001 WL 26213, at *5; *Mabry* v. *Johnson*, 467 U.S. 504, 508 (1984); *Brady* v. *United States*, 397 U.S. 742, 756 (1970))). Valdez did not allege that his counsel was constitutionally ineffective, or that he was factually innocent. (*Id.* (citing *Murray*, 2001 WL 26213, at *5)). And while the record reflected some hesitancy by Valdez, initial reluctance does not invalidate a plea when the totality of the circumstances indicates that the defendant ultimately entered the plea voluntarily. (*Id.* (citing *Brady*, 397 U.S. at 749)). Accordingly, Judge Cave concluded that Valdez had not demonstrated by clear and convincing evidence that the First Department's decision rejecting his challenge to his guilty plea was contrary to or an unreasonable application of clearly established federal law. (*Id.* (citing 28 U.S.C. § 2254(d)(1), (e)(1))).

With respect to section 2254(d)(2), Valdez argued that the First Department's finding that the trial court's "clarifying questions" sufficiently ensured that there was no doubt of Valdez's guilt or the voluntariness of his plea was an unreasonable determination of the facts. (Report 29-30). In

11

particular, Valdez asserted that Justice Berkman "was on notice" that Valdez's plea would not be routine and needed to undertake "extraordinary care and prudence," but instead questioned him "in a highly leading and suggestive manner" designed to "induc[e him] to make specific affirmative statements regardless of their veracity." (*Id.* at 30).

Judge Cave likewise found this argument unpersuasive. Invoking the deferential standard a court must apply in reviewing a challenge to a guilty plea, Judge Cave determined that the totality of the allocution demonstrated that Justice Berkman took the necessary steps to ensure that Valdez's guilty plea was knowing and voluntary. (Report 30). Justice Berkman conducted two competency hearings to thoroughly evaluate Valdez's fitness; confirmed that Valdez shot the victim intentionally; recessed the proceedings to give Valdez time to consult with his counsel, who represented that Valdez was aware of his possible defenses and was willing to proceed with his guilty plea; informed Valdez of the rights that he was giving up by pleading guilty; and warned Valdez of the potentially greater sentence if he were to proceed to trial. (*Id.*). In addition, it was undisputed that Valdez had entered guilty pleas on at least two prior occasions, and therefore, notwithstanding his intellectual disabilities, was familiar with the significance and consequences of a guilty plea. (*Id.*). In short, Judge Cave found that Valdez had failed to point to clear and convincing evidence rebutting the strong presumption of the validity of his guilty plea and therefore had not demonstrated that he was entitled to relief under section 2254(d)(2). (*Id.* at 30-31 (citing *Blackledge*, 431 U.S. at 74; *Murray*, 2001 WL 26213, at *4-5)).

Finally, Judge Cave addressed Valdez's challenge to his sentence, which he argued should be reduced from 18 years' to life imprisonment, to the statutory minimum of 15 years to life. (Report 31-32). Judge Cave explained that even if the Court were to assess the merits of Valdez's constitutional challenge to his sentence, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." (*Id.* at 31 (quoting *White* v. *Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992))). Because Valdez's sentence was within the range provided by New York law, *see* N.Y. Penal Law § 70.00(2)(a), 3(a)(i), Judge Cave found that Valdez had not stated a claim for *habeas* relief based on his sentence. (*Id.* at 31 (citing, *inter alia*, *Bell* v. *Ercole*, 631 F. Supp. 2d 406, 419 (S.D.N.Y. 2009))).

In light of her findings, Judge Cave recommended that Valdez's Petition be denied in its entirety and that his request in the alternative to stay the Petition also be denied. (Report 32). Judge Cave further recommended that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A). (*Id.*).

## E.    The Objection

Valdez requested, and this Court granted, an extension of time to file objections to the Report. (Dkt. #28, 29). The Court received Valdez's Objection on February 17, 2020. (Dkt. #30). In it, Valdez asserts several objections to the Report and requests that the Court issue an Order to vacate his conviction and sentence.

*First*, Valdez repeats his argument that he is entitled to *habeas* relief under section 2254(d)(1) because the First Department unreasonably

applied facts to the governing federal law.  (Objection 5-8).  The federal law in question, which both the Report and Valdez recognize, is that a guilty plea must be knowing, intelligent, and voluntary.  (*Id.* at 4; Report 22). Valdez argues that the Report errs in failing to "expressly address the Appellate Division's characterization of Mr. Valdez's documented mental condition and asserted psychiatric defenses as being 'nothing' which warranted an inquiry into whether his guilty plea was knowing, voluntary and intelligent."  (Objection 7).

*Second*, Valdez objects to the Report's finding that he was not entitled to relief under the "unreasonable determination" provision of § 2254(d)(2) because he did not show by clear and convincing evidence that the state court's factual determinations were incorrect.  (Objection 10).  He argues that the Report did not address the factual determination by the First Department that "'whenever [Mr. Valdez] made a statement that could be viewed as negating an element of the crime or raising a defense, the court asked clarifying questions that ensured that the allocution ultimately cast no doubt on defendant's guilt or the voluntariness of his plea.'"  (*Id.* at 8 (quoting *People* v. *Valdez*, 138 A.D.3d at 465)).

*Third*, while noting that the Report did not recommend that the Petition be denied solely because of procedural default, Valdez reiterates his position that his claim should not be denied on that basis.  (Objection 11).

## DISCUSSION

### A.    Applicable Law

When deciding whether to adopt a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge."  28 U.S.C.

§ 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).  To the extent that a

petitioner makes specific objections to a magistrate judge's findings, the

reviewing court must undertake a *de novo* review of the objections.  *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *United States* v. *Male Juvenile*, 121

F.3d 34, 38 (2d Cir. 1997).  However, where objections are "conclusory or

general," or where the petitioner "simply reiterates his original arguments,"

the report should be reviewed only for clear error.  *Walker* v. *Vaughan*, 216

F. Supp. 2d 290, 292 (S.D.N.Y. 2002) (internal quotation marks and citation

omitted).  A magistrate judge's decision is clearly erroneous only if the

district court is "'left with the definite and firm conviction that a mistake has

been committed.'"  *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001) (quoting

*United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## B.    Analysis

The Court finds that Valdez's objections to the Report merely restate

his original arguments.  (*Compare* Objection 5-8, *with* Dkt. #26 at 24-26,

*and* Objection 8-10, *with* Dkt. #26 at 26-28).  Judge Cave recognized and

thoroughly assessed each of these arguments and found them to be lacking.

(*See* Report 27-31).  This Court agrees with the Report's reasoning and

conclusions, and identifies no error, let alone clear error, in either.

Accordingly, the Court adopts the Report in its entirety.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Cave's

well-reasoned and comprehensive Report in full.  Accordingly, Valdez's

Petition for a writ of *habeas corpus* is DENIED, as is his request to stay the

Petition.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

Furthermore, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), as Valdez has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

SO ORDERED.

Dated:      February 17, 2021
            New York, New York      _____
                                        KATHERINE POLK FAILLA
                                      United States District Judge

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNI VALDEZ,<br><br>                              Petitioner,<br><br>         against<br><br><br>ECKERT STEWART,<br><br>                              Respondent. | CIVIL ACTION NO.: 17 Civ. 4121 (KPF) (SLC)<br><br>**REPORT AND RECOMMENDATION** |

**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE KATHERINE POLK FAILLA**, United States District Judge:

<h1 style="text-align:center">I.   <u>INTRODUCTION</u></h1>

Petitioner Denni Valdez ("Valdez"), an inmate at Wende Correctional Facility in Alden, New York, filed a pro se petition for writ of habeas corpus (the "Petition") pursuant to 28 U.S.C. § 2254, following his 2012 conviction, after a guilty plea, in New York State Supreme Court, New York County, for second degree murder.  (See ECF Nos. 1; 16-6 at 41[1]).  The state court sentenced him to prison for 18 years to life.  (ECF Nos. 1 at 1; 16-7 at 11).

Valdez, who suffers from significant developmental disabilities, raises two claims in his Petition:  that his guilty plea was unlawfully induced and not voluntary and knowing, and that his sentence was excessive.  (ECF No. 1 at 2, 4).  Respondent opposes on the grounds that Valdez's claim is barred by procedural default, and in the alternative, he was fully competent and aware at the time of his plea, and therefore the Appellate Division correctly applied Supreme Court precedent in affirming the trial court's acceptance of the plea and imposition of the sentence.

---

[1] Page numbers refer to the ECF page number, unless otherwise noted.

(ECF Nos. 10, 11).  After the Honorable Henry B. Pitman appointed counsel for Valdez (ECF No. 23), his counsel submitted a supplemental brief arguing that his challenge to his guilty plea is not procedurally defaulted (or in the alternative that his petition should be stayed while he moves to vacate his plea in New York State Court), and that the First Department unreasonably applied the law and unreasonably determined the facts in affirming his conviction (ECF No. 26).

For the reasons set forth below, the Court respectfully recommends that the Petition be dismissed in its entirety.

## II.   BACKGROUND

### A.  Factual Background

On April 12, 2011, Valdez approached from behind the victim Joshua Nelson, who was walking with two women pushing strollers; removed his gun, which was covered in a sock; shot Nelson in the chest and leg; fled; removed the hooded sweatshirt he had been wearing; and hid the gun in another person's apartment.  (ECF Nos. 10-3 at 49; 11 at 6–7; 16-6 at 20).  Nelson was unarmed when Valdez shot him.  (ECF No. 16-6 at 37).  Valdez alleged that Nelson had been bullying him on the days Valdez received his disability checks.  (Id. at 22; ECF No. 10-1 at 7).  Valdez testified at his allocution that, on the day of the shooting, he had obtained the gun from someone named Moises, who told Valdez that he would give him $1,000 to shoot Nelson.  (ECF No. 16-6 at 32).  Moises did not, in fact, pay Valdez any amount after the shooting.  (Id. at 35).  Valdez was arrested later the same day, at which time the police executed search warrants on his apartment in a residence for people with disabilities, as well as the apartment of a neighbor and friend, and recovered a loaded revolver with three spent rounds and Valdez's hooded sweatshirt.  (ECF Nos. 10-1 at 6; 10-2 at 10).

**B.**   <u>Procedural History</u>

**1.**   <u>The indictment</u>

In an indictment dated May 11, 2011, a grand jury in New York State Supreme Court indicted Valdez on one count of second-degree murder for the death of Joshua Nelson on April 12, 2011 in violation of N.Y. Penal Law § 125.25(1), and one count of criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03(3).  (ECF No. 10-1 at 2–3).

Following his arraignment, Valdez's counsel gave notice of his intent to proffer psychiatric evidence under New York Criminal Procedure Law § 250.10(2), based on the fact that Valdez is "profoundly delayed, with an I.Q. of under 70," was in special education throughout his youth, and depended on the "continual care of clinicians and social workers" to function in society.  (ECF No. 10-1 at 10–11).  As a result of his cognitive impairment, his counsel argued, Valdez was not criminally responsible for his actions on the day of the murder, or, in the alternative, "acted under the influence of extreme emotional disturbance."  (<u>Id.</u> at 11).  Based on this assertion, Justice Carol Berkman ordered an examination of Valdez to determine his competence to stand trial pursuant to New York Criminal Procedure Law Article 730 ("Article 730") to assess Valdez's mental competence to participate in the criminal proceedings against him.  (ECF No. 10-2 at 11).

**2.**   <u>Article 730 proceedings</u>

**a.**   <u>First hearing</u>

On March 12, 2012, Justice Berkman conducted a hearing under Article 730 to assess Valdez's mental competence.  (ECF No. 16-1 at 10–11) (the "First 730 Hearing").  The defense presented reports and testimony by two experts:  Dr. Jennifer Rosner, a psychologist at Bellevue Hospital (ECF Nos. 10-1 at 34–35; 16-3 at 3–4); and Dr. Myles Schneider, a psychiatrist at Bellevue

Hospital (ECF Nos. 10-1 at 42–43; 16-1 at 12–13).  Both had examined Valdez's educational and medical records, and evaluated him in-person on December 29, 2011.  (ECF No. 10-1 at 34–46).

### i.  Dr. Rosner

Dr. Rosner's report described her interview of Valdez and review of his educational records, arrest record, and the results of two intelligence tests administered in 2011.  (ECF No. 10-1 at 37).  Dr. Rosner noted that Valdez was born HIV-positive and was physically abused by his father as a child.  (Id. at 38).  At age nine, he was classified at "Educable Mentally Retarded" and placed in special education classes for the duration of his academic career.  (Id. at 38).  A 2011 intelligence test showed that Valdez had a full-scale I.Q. score of 59, which is in the "Extremely Low" range.  (Id.)[2]  From her interview, Dr. Rosner found Valdez's speech to be "slow and hesitant" and noted that he "seem[ed] eager to please and suggestible."  (Id. at 39).  While he had "a basic awareness of the allegations against him," he had "difficulty learning and retaining information about relevant legal concepts and courtroom proceedings," such that it seemed he was "merely parroting back the information presented to him, such as a review of his plea options, without gaining a more meaningful understanding of this information."  (Id.)  Dr. Rosner concluded, based on Valdez's "longstanding intellectual impairment," that he was "not fit" to proceed with his criminal proceedings.  (Id.)  She recommended "[n]eurocognitive rehabilitation

---

[2] One I.Q. test performed in 2011 was the Wechsler Adult Intelligence Scale-Third Edition ("WAIS 3"). The WAIS 3 was superseded in 2008 by a more recent version, "WAIS 4," which would have been the preferred version to use.  (ECF No. 10-1 at 38; 16-1 at 50–51; 16-3 at 29).  Dr. Rosner did not discuss the other test performed in 2011, the Wide Range Achievement Test, in detail.  (ECF No. 10-1 at 37).

4

and concentrated legal education" as potentially able to assist him in understanding the legal process.  (Id. at 40).

The parties stipulated to the entry of Dr. Rosner's report, and her direct testimony was consistent with her report.  (ECF No. 16-3 at 3–15).  On cross-examination by the prosecutor, Dr. Rosner conceded that she had not spoken with Valdez's friends, girlfriend, or relatives, anyone at the Addicts Rehabilitation Center (where Valdez resided), anyone at Correctional Health Services, or his treating physicians.  (Id. at 20–21).  The prosecution also demonstrated that at the time of her examination and report, Dr. Rosner was not aware of or did not closely examine the facts that Valdez:  (1) registered as a voter (id. at 22); (2) maintained three bank accounts (id.); (3) successfully applied and renewed his non-driver's identification from the Department of Motor Vehicles (id.); (4) pleaded guilty to second degree reckless endangerment in 2008, to a local ordinance violation, and to disorderly conduct (id. at 31–33; ECF No. 16-1 at 52, 54–55); (5) filed five complaints with the New York City Police Department alleging that he was the victim of a crime (see ECF No. 16-3 at 34); and (6) maintained profiles on social media (ECF No. 16-4 at 2). She acknowledged that she would have taken these facts into account in her analysis of Valdez's fitness for trial.  (ECF No. 16-4 at 6–7).

### ii.   Dr. Schneider

Dr. Schneider's report noted the same educational background and intelligence test results that Dr. Rosner had described in her report, but also took note of at least two incidents when Valdez had sustained head trauma, including a bike accident and an assault.  (ECF No. 10-1 at 45–46).  Dr. Schneider found that Valdez "had substantial difficulty in understanding the role of different principals in the legal process even when this was repeated on a number of

occasions," and he "had difficulty understanding the concept of a plea bargain." (Id. at 46). Based on his examination, Dr. Schneider found that Valdez "lacks the capacity to cooperate rationally in his defense" and was therefore "not fit to proceed." (Id. at 46). He recommended rehabilitative services to restore Valdez to competency to stand trial. (Id.)

The parties stipulated to the entry of Dr. Schneider's report, and his direct testimony was consistent with his report. (ECF No. 16-1 at 12–19). On cross-examination by the prosecution, Dr. Schneider acknowledged that Valdez had told him he knew he had been charged with murder involving a gun. (Id. at 21). Dr. Schneider conceded that he did not speak to any of Valdez's relatives, friends, or former defense attorneys, nor any personnel at Correctional Health Services, treating physicians, or social workers. (Id. at 25–26, 39–40). The prosecution also demonstrated that Dr. Schneider was not aware of or did not closely examine the facts that Valdez:   (1) registered to vote as a Democrat (id. at 29); (2) had three bank accounts (id. at 30); (3) sought and obtained a replacement for his non-driver identification card (id. at 34); (4) maintained email and social media accounts (id. at 41–48); (5) graduated from high school with a special education diploma (ECF No. 16-2 at 45); (6) pleaded guilty in 2004 to a local ordinance violation, in 2008 to a second degree reckless endangerment misdemeanor, and to disorderly conduct (ECF Nos. 16-1 at 52, 54–55; 16-3 at 31–33); and (7) worked at Modell's in 2006 (ECF No. 16-2 at 23). After learning these facts during the prosecutor's questioning, Dr. Schneider testified that he felt "less confident" of Valdez's incapacity. (Id. at 49).

### iii.    Trial court's ruling

After hearing from both experts and from counsel for both sides, Justice Berkman noted that there is a presumption of competence, but that once the presumption has been rebutted,

the prosecution bears the burden of persuasion.  (ECF No. 16-4 at 44).  The court noted that both experts admitted that they were "misinformed" in some respects and "uninformed" in other respects concerning Valdez's background that could change their approach to the determination of fitness.  (Id.)  The trial court therefore ordered new examinations by both Dr. Rosner and Dr. Schneider, which took place on April 19, 2012, and scheduled a second hearing.  (ECF Nos. 10-1 at 49–68; 10-2 at 1; 16-5 at 5, 8).

### b.  Second 730 hearing

On May 8, 2012, Justice Berkman conducted a second hearing to assess Valdez's mental competence.  (ECF No. 16-5 at 17) (the "Second 730 Hearing").  The defense presented reports and testimony from Dr. Rosner and Dr. Schneider.

### i.  Dr. Rosner

In her second report, Dr. Rosner concluded that Valdez did not lack capacity to understand the criminal proceedings or assist in his defense, and was fit to proceed.  (ECF Nos. 10-1 at 62, 64; 10-2 at 1).  In addition to the records she reviewed for her first report, she had also reviewed Valdez's:  (1) arrest records including the transcript of his interrogation on the murder charge; (2) social media posts and emails; (3) DMV records; (4) voter registration; (5) bank records; (6) housing and case management records from Addicts Rehabilitation Center; and (7) prison health records.  (ECF No. 10-1 at 64–65).  In the interview, Valdez admitted to four prior arrests for misdemeanors relating to weapons and drug possession.  (Id. at 66).  He described his HIV medication regimen while in prison, which involved taking a packet of medication twice a day and visiting the pharmacy for refills regularly.  (Id. at 67).  Dr. Rosner found no suicidal or homicidal inclinations, and no psychotic symptoms.  (Id.)  Although he did not know the date on

which the interview was taking place, he explained that he keeps a calendar for important dates and events, such as court appearances. (Id.) Dr. Rosner noted that the transcript of his interrogation reflected a "capacity to recount the events leading to his arrest in response to structured questioning," and a "rudimentary understanding of the roles of courtroom personnel and legal proceedings." (Id. at 68). His statements that he was "trying to get less time" by pleading guilty, Dr. Rosner found, suggested "a basic understanding of the plea bargain process." (Id.) Dr. Rosner concluded that, despite his intellectual limitations, Valdez had a basic understanding of the charges against him, his legal options, how to seek legal advice, and with "additional structure and simplistic, straightforward explanations," should be able to assist with his defense. (Id. at 68; ECF No. 10-2 at 1).

In her testimony at the Second 730 Hearing, Dr. Rosner explained that her opinion of Valdez's fitness had changed based on his showing a "much broader understanding of the legal case against him and the implications" of a potential conviction, as well as his ability to seek assistance from the people around him, in particular, his counsel. (ECF No. 16-5 at 22–24).

### ii.   Dr. Schneider

In his second report, Dr. Schneider reviewed the same supplemental records that Dr. Rosner reviewed. (ECF No. 10-1 at 51). In addition, Dr. Schneider spoke with Valdez's social worker, who described Valdez as developmentally delayed and not good at managing money. (Id. at 52). She explained that his sister's boyfriend had paid Valdez to open one of the bank accounts, from which the boyfriend began writing bad checks, and Valdez made a police report with the social worker's assistance. (Id.) In his interview, Valdez acknowledged his prior guilty pleas, stated that he would consider pleading guilty to the murder charge to get a shorter

sentence, and discussed with his attorney possible sentences, including life in prison.  (Id. at 58).

Based on the supplemental information and follow-up interview, Dr. Schneider concluded that

while Valdez has been classified as educable mentally retarded and developmentally delayed, he

had the capacity to understand the charges against him and the nature of the legal proceedings,

and to cooperate in his defense; therefore, he was fit to proceed with the criminal case.  (Id. at

59).

        In his testimony at the Second 730 Hearing, Dr. Schneider explained that his opinion as to

Valdez's fitness had changed in part due to inconsistencies in the records as to the level of his

mental disability, which was mitigated by Valdez's capacity and willingness to seek help.  (ECF

No. 16-5 at 49–50).  He also noted Valdez's recognition of "the gravity of his circumstances" as

he faced the murder charge, and his capacity to cooperate in his defense in the hope of reducing

his sentence.  (Id. at 52–53).

        Justice Berkman heard further argument from counsel, and then concluded, based on

both experts' opinion that Valdez was fit, that he was in fact fit to continue with the proceedings

against him.  (ECF No. 16-6 at 17).  At the close of the hearing, Justice Berkman indicated her

inclination to offer a sentence of 18 years to life if Valdez pleaded guilty.  (Id. at 24).

### 3.  Plea proceedings

        At a June 27, 2012 hearing, Valdez's counsel informed Justice Berkman that Valdez was

prepared to plead guilty.  (ECF No. 16-6 at 29).  Justice Berkman proceeded to ask Valdez whether

he understood that he was being charged "with the intent to cause the death of another person

. . . Joshua Nelson" on April 12, 2011.  (Id. at 30).  Valdez responded, "Not really, but, you know,

like, he was bullying me."  (Id.)  The colloquy continued:

9

THE COURT:    He was bullying you so well, Mr. Valdez, it wasn't just that he was bullying

you, you were selling marijuana, weren't you?

THE DEFENDANT:    No, I wasn't.  I was --

THE COURT:    You weren't?  So he was bullying you?  And did he have a weapon at the

time that you killed him?

THE DEFENDANT:    What you mean?  What you mean by that?

THE COURT:    I'm sorry?

THE DEFENDANT:    I cannot understand what you mean by that.

THE COURT:    Well, did he have a weapon?  Was he pointing a weapon at you?

THE DEFENDANT:    If he had a weapon on him?

THE COURT:    Uh-huh.

THE DEFENDANT:    Yes.

THE COURT:    How do you know that?

THE DEFENDANT:    Because he took his book bag off and he like he took out something.

I didn't even know.

THE COURT:    He took what?

THE DEFENDANT:    I wasn't in the right state of mind.

(ECF No. 16-6 at 30–31).

Justice Berkman then tried to break the facts into smaller pieces:

THE COURT:    I'm sorry, so here's the story:  Where did you get the gun?

THE DEFENDANT:    From Mo.

THE COURT:    So you knew that Joshua Nelson was out on the street?

10

THE DEFENDANT:       No, he was following me.

THE COURT:    He was following you, so you went home?

THE DEFENDANT:       I ain't went home.  I was outside already.

THE COURT:    I'm sorry, so you went out with the gun?

THE DEFENDANT:       I was in the store, that's where I got the gun from.

THE COURT:    You went to the store with a gun in your pocket?

THE DEFENDANT:       He gave it to me.

THE COURT:    Who gave it to you?

THE DEFENDANT:       Mo.

THE COURT:    Who?

. . .

THE DEFENDANT:       Mo, Moises.

THE COURT:    Moises gave you the gun.  When did he give you the gun?

THE DEFENDANT:       That day.

THE COURT:    I see.  And was there a particular reason he gave you a gun?

THE DEFENDANT:       He said, "I'll give you a thousand dollars to run and shoot him."

THE COURT:    So, in fact --

THE DEFENDANT:       That day I wasn't in the right state of mind.

(ECF No. 16-6 31–32).

Justice Berkman undertook to clarify the motive for the murder:

THE COURT:    I see.  So, in fact, you didn't kill Joshua Nelson because he was bullying you,

you killed him for money, murder for hire; is that right?

11

THE DEFENDANT:     No, he robbed me.  He took money away from me.

THE COURT:   When was that?

THE DEFENDANT:     That day.

THE COURT:   I see.  Was that at the same time as you killed him?

THE DEFENDANT:     Yeah.

THE COURT:   So he was robbing you?

THE DEFENDANT:     Yes.

THE COURT:   Uh-huh.  And what weapon was he using to rob you?

THE DEFENDANT:     I had showed the weapon, but I know he had a weapon.

THE COURT:   Okay.  Mr. Valdez, I think you need to chat with your lawyer some more because you keep telling me different stories.  And while it may be, Mr. Valdez, that you are perfectly capable of dealing -- well, not perfectly, but you're capable of dealing more so than you have been pretending to, you are not smart enough to look me in the face and lie to me and get away with it.

(ECF No. 16-6 at 32–33).

Justice Berkman then recessed the proceedings and Valdez consulted with his counsel, who, after the break, informed the court that Valdez was prepared to proceed with the guilty plea to the murder charge.  (Id. at 33–34).  Justice Berkman resumed the colloquy:

THE COURT:   So here's the story, Mr. Valdez: Did you, in fact, shoot and kill Joshua Nelson?

THE DEFENDANT:     Yes.

> THE COURT:    Uh-huh.  And you did that because you don't like him or didn't like him, did you, for whatever your reasons; is that correct?
>
> THE DEFENDANT:    Yes.
>
> THE COURT:    And you did it also because this guy, what's his name, Moises paid you and gave you a gun to do it with, correct?
>
> THE DEFENDANT:    Yes.
>
> THE COURT:    I don't want to put words in your mouth, Mr. Valdez.  Is that, in fact, actually what happened?

(ECF No. 16-6 at 34–35).  Valdez's counsel interceded to note that the court had asked a two-part question and that Moises had given Valdez the gun, but he did not pay him any money.  (Id. at 35).  Justice Berkman resumed the colloquy:

> THE COURT:    Well, this morning you told me he gave you a thousand bucks?
>
> THE DEFENDANT:    No, he didn't, he didn't pay me.
>
> THE COURT:    He promised you a thousand bucks?
>
> THE DEFENDANT:    Yeah.
>
> THE COURT:    But he never paid you.
>
> THE DEFENDANT:    No.

(ECF No. 16-6 at 35).  Setting aside the question of the motive of "Moises," Justice Berkman turned to the victim:

> THE COURT:    And so let's talk about Joshua.  Was he holding a weapon?
>
> THE DEFENDANT:    I think so.
>
> THE COURT:    You think so.  But when you went out to fulfill your contract --

13

THE DEFENDANT:        He had a pistol.

THE COURT:    -- gun in your hand, you didn't think that Joshua was going to be attacking

you now, did you?

THE DEFENDANT:        I thought he was going to be attacking me.

THE COURT:    You thought, I'm sorry?

THE DEFENDANT:        He had his fists up.

THE COURT:    He had his fists up.

THE DEFENDANT:        Yeah.

THE COURT:    Well, Mr. Valdez, he had his hands up like this because you were pointing

a gun at him, like hands up, like people do when they are being robbed in the bank, hands

up, right?

THE DEFENDANT:        No, he had his fists up.

THE COURT:    Palms open?  It's all on videotape.

(Id. at 36).  Valdez's counsel interceded again to try to clarify, and Justice Berkman proceeded

with the colloquy:

THE COURT:    Hmm.  So which is it?

THE DEFENDANT:        He had his fists up.

THE COURT:    So he had his fists up, like this, the way I am?

THE DEFENDANT:        He wanted to fight me.

THE COURT:    I'm sorry, so he had his fists up like this?

THE DEFENDANT:        Yes.

THE COURT:    Just fists; is that right?

14

THE DEFENDANT:        Yeah.

THE COURT:    Was that before or after you point the gun at him?

THE DEFENDANT:        That was before.

THE COURT:    So he puts his fists up and you figure that the way to deal with this is to shoot him three times?

THE DEFENDANT:        I didn't shoot him three times.

THE COURT:    How many times did you shoot him?

THE DEFENDANT:        I shoot him twice.

THE COURT:    Just twice.  And you never saw a weapon, correct?

THE DEFENDANT:        No.

THE COURT:    So he just did a boxing stance ready to punch you in the nose, is that about it?

THE DEFENDANT:        Yes.

THE COURT:    And you don't run away from him, you just shoot him twice?

THE DEFENDANT:        Yes.

(ECF No. 16-6 at 36–38).  Valdez was at first unable to answer the question of how far he was from the victim when he pulled the trigger, but then agreed that he was about twelve feet away. (Id. at 38–39).  Justice Berkman continued:

THE COURT:    And when you shot him twice, you meant to kill him; is that correct?

THE DEFENDANT:        I didn't mean to kill him.

THE COURT:    What did you mean to do?  You were hoping for a thousand bucks for killing him, weren't you?

15

> THE DEFENDANT:     Yes.
>
> THE COURT:     So you meant to kill him, didn't you?
>
> THE DEFENDANT:     Yes.

(Id. at 39).  The court then informed Valdez that the minimum sentence was fifteen years to life, and the maximum 25 years to life, and noted that if the prosecution were to go back to the grand jury seeking a charge of murder for hire, the sentence could be life without parole.  (Id.)  With the plea, the court explained, he was being promised a sentence of 18 years to life.  (Id.)  Valdez stated that he understood his sentence, and that no one had made him any other promises or threatened or forced him to plead guilty.  (Id. at 40).  Justice Berkman then advised him of the rights he was giving up by pleading guilty:

> THE COURT:     When you plead guilty, it is the same as though you were convicted after trial, but you give up your trial rights:  Your right to a trial by jury.  You right to confront the witnesses against you.  Your right to have your attorney cross-examine those witnesses.  You give up your right to bring in evidence in your own behalf and you also give up your right to remain silent.  Do you understand that?
>
> THE DEFENDANT:     Yes.
>
> THE COURT:     And, of course, this is a felony conviction.  You get into trouble in the future, you will get more time in your next case because of this one.  And I assume you're a citizen of the United States, but just in case you're not, this conviction will result in deportation, denial of citizenship, denial of reentry should you leave the country.  Do you understand, sir?

(ECF No. 16-6 at 40–41).

There was another pause in the proceedings while Valdez consulted with his counsel, and then answered, "Yes." (Id. at 41). The clerk then entered the plea:

COURT CLERK: Mr. Valdez, sir, do you now withdraw your previously entered plea of not guilty and, sir, do you now enter a plea of guilty to the crime of murder in the second degree, the first count of the Indictment Numbered 1996 of 2011 and that plea will cover and satisfy your entire indictment? Is that your plea, sir?

THE DEFENDANT:      Guilty.

[DEFENSE COUNSEL]: That is a yes.

COURT CLERK: "Yes"?

THE DEFENDANT:      Yes.

(Id.)

### 4.  Sentencing proceedings

On July 19, 2012, Justice Berkman held a sentencing hearing at which Nelson's father and girlfriend gave victim impact statements. (ECF No. 16-7 at 2–9). Given the opportunity to make a statement, Valdez said, "I'm sorry." (Id. at 10). Justice Berkman then pronounced the sentence of 18 years to life imprisonment and recommended psychiatric counseling. (Id. at 11).

### 5.  Direct appeal

Valdez, through counsel, appealed his conviction and sentence to the First Department, raising two issues: (1) his guilty plea was not knowing, intelligent, and voluntary, and (2) his sentence was excessive. (ECF No. 1 at 2, 4). The First Department affirmed his conviction, holding that he had failed to preserve any challenge to his guilty plea, and, in the alternative, that his plea was knowing, intelligent and voluntary. People v. Valdez, 138 A.D.3d 464 (1st Dep't 2016). The court noted that, during the plea colloquy, "whenever [Valdez] made a statement that could be

viewed as negating an element of the crime or raising a defense, the court asked clarifying questions that ensured that the allocution ultimately cast no doubt on [his] guilt or the voluntariness of his plea." Id. The court also noted that, following the "extensive" Article 730 proceedings, the trial court found that Valdez was competent, and "there was nothing to warrant an inquiry into whether [his] mental condition impaired his ability to understand the proceedings, or into whether he waived any potential psychiatric defenses." Id. The First Department also rejected the challenge to his sentence. Id. On July 7, 2016, the Court of Appeals denied leave to appeal. (ECF Nos. 1 at 2, 15; 10-3 at 62).

### C. Federal Habeas Corpus Petition

On May 31, 2017, Valdez timely filed his pro se petition, challenging his conviction on the ground that his guilty plea was unlawfully induced and not knowing and voluntary. (ECF No. 1 at 4). Respondent opposed the petition, arguing that Valdez's challenge to his guilty plea was procedurally defaulted, or, in the alternative, failed on the merits. (ECF No. 11). Although Valdez's Petition did not challenge his sentence (see ECF No. 1 at 4), Respondent's opposition sets forth arguments why that claim is not cognizable on habeas review and why his sentence was fair and reasonable. (Id. at 58-60).

Valdez moved for the appointment of counsel, on the grounds that he is "a mental health patient with a[n] MHU Level 2 status, presently prescribed with MHU medication, mentally retarded, illiterate, and destitute." (ECF No. 13 at 1). Valdez subsequently wrote to the court to point out that Respondent had not included in his opposition the transcripts for his plea and sentencing, and requested that Respondent be ordered to provide those materials to him. (ECF No. 14). He also requested an extension of time to respond to Respondent's opposition, noting

that he had obtained legal assistance to help him with his case.  (Id.)  Respondent later provided

Valdez with the transcripts he requested.  (ECF No. 16).

Valdez submitted a pro se reply to Respondent's opposition in which he argued that his

circumstances justified an exception to the preservation rule, and that his plea was defective

because he had asserted a justification defense.  (ECF No. 20 at 4–10).  Valdez conceded that his

excessive sentence claim was not cognizable on habeas review, but argued that the Court should

review the claim because the state courts had unreasonably applied federal law.  (Id. at 10–12).

On September 14, 2018, Magistrate Judge Pitman granted Valdez's motion for

appointment of counsel, pointing to the complexity of the analysis of whether his claims are

procedurally barred and his "documented cognitive defects."  (ECF No. 23 at 3).  Thereafter,

Jeffrey G. Pittell, Esq., entered an appearance on behalf of Valdez (ECF No. 24) and submitted a

Supplemental Memorandum of Law in Further Support of the Petition addressing only the

challenge to Valdez's guilty plea (ECF No. 26).

### III.    DISCUSSION

#### A.  Applicable Legal Standards

##### 1.  Exhaustion

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may not consider a petition for a writ of habeas corpus by a prisoner in state custody unless

the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); see Jackson v.

Conway, 763 F.3d 115, 133 (2d Cir. 2014).  To satisfy the exhaustion requirement, the petitioner

must have "fairly presented" his claims to the state courts, thereby affording those courts the

opportunity to correct the alleged violations of federal rights.  Picard v. Connor, 404 U.S. 270, 275

(1971).  The exhaustion requirement is fulfilled once the federal claims have been presented to

"the highest court of the state."   Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal

citation omitted).

In addition, under the doctrine of adequate and independent state grounds, a state

habeas petitioner's claim is barred "if the state judgment can be sustained on state law grounds

that are independent of the federal questions raised and that are adequate to support the

judgment."  Acosta v. Giambruno, 326 F. Supp. 2d 513, 520 (S.D.N.Y. 2004).  When the highest

state court that rendered a judgment in the case "'clearly and expressly states that its judgment

rests on a state procedural bar'" it will be presumed that such procedural bar constitutes

independent and adequate state grounds to deny habeas relief."  Harris v. Reed, 489 U.S. 255,

263 (1989) (internal citations omitted); see Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d

Cir. 1995) (finding habeas claim barred where Appellate Division held that review of claim was

procedurally barred).

A court may excuse procedural default "if the petitioner demonstrates either cause for

the default and actual prejudice from the alleged violation of federal law, or that the failure to

consider the claims 'will result in a fundamental miscarriage of justice.'"  Acosta, 326 F. Supp. 2d

at 520 (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)).  For this purpose, "cause"

means "'some objective factor external to the defense [that] impeded counsel's efforts' to raise

the claim in state court."  Id. (quoting McCleskey v. Zant, 499 U.S. 467, 493 (1991)).  "Actual

prejudice" requires the petitioner to show "'actual and substantial disadvantage, infecting his

entire trial with error of constitutional dimensions.'"  Id. (quoting United States v. Frady, 456 U.S.

152, 170 (1982)).  "A miscarriage of justice occurs 'in an extraordinary case, where a

constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Id. (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).   "To establish actual innocence, petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him."   Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002) (internal citation omitted); see Bousley v. United States, 523 U.S. 614, 623–24 (1998) ("'actual innocence' means factual innocence, not mere legal insufficiency").

   2. **Standard of review**

   If the state court has reached the merits of a claim, this Court must apply a "highly deferential" standard in reviewing that claim in a habeas corpus proceeding.  28 U.S.C. § 2254(d); Renico v. Lett, 559 U.S. 766, 773 (2010); Williams v. Taylor, 529 U.S. 362, 413 (2000).  A claim has been "adjudicated on the merits" when the state court ruled on the substance of the claim itself, rather than on a procedural or other ground.  See Bell v. Miller, 500 F.3d 149, 154–55 (2d Cir. 2007); Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced").

   The standard of review set forth in Section 2254(d) provides, in relevant part, that a court may grant a writ of habeas corpus on a claim that has been previously adjudicated on the merits by a state court only if the state adjudication:

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established federal

law where the state court either applies a rule that contradicts Supreme Court precedent or

confronts a case with materially similar facts to a Supreme Court case and arrives at a different

result.  See Rosario v. Ercole, 601 F. 3d 118, 123 (2d Cir. 2010) (quoting Williams, 529 U.S. at 412–

13).  An "unreasonable application" of clearly established federal law occurs when the state court

identifies and applies the correct governing legal principle, but its application was "objectively

unreasonable."  Lockyer v. Andrade, 538 U.S. 63, 73–76 (2003) (citing Williams, 529 U.S. at 409).

Under section 2254(d)(2), the Court must consider the reasonableness of the decision in light of

the evidence presented at the proceeding under review.  See Cardoza v. Rock, 731 F.3d 169, 182

(2d Cir. 2013).  Even if the standard under Section 2254(d)(2) is met, the petitioner "still bears

the ultimate burden of proving by a preponderance of the evidence that his constitutional rights

have been violated."  Id. (internal quotation and citation omitted).  The question under the

AEDPA "is not whether a federal court believes the state court's determination was incorrect but

whether that determination was unreasonable, which is a substantially higher threshold."

Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

### 3.  Habeas corpus review of guilty pleas

Due process dictates that a guilty plea must be voluntary, knowing, and intelligent.  See,

e.g., Bousley v. United States, 523 U.S. 614, 618 (1998); Mabry v. Johnson, 467 U.S. 504, 508

(1984); Brady v. United States, 397 U.S. 742, 748 (1970).  The voluntariness of a guilty plea is

—

reviewed by examining the totality of the circumstances, <u>Brady</u>, 397 U.S. at 749, and absent clear and convincing evidence, "[a] state court's determination of the voluntariness of a defendant's guilty plea is a factual issue that is entitled to a presumption of correctness on habeas review." <u>Murray v. McGinni</u>s, No. 00 Civ. 3510 (RWS), 2001 WL 26213, at *4 (S.D.N.Y. Jan. 10, 2001); <u>see</u> <u>Rodriguez v. Bradt</u>, No. 09 Civ. 10285 (LTS) (DF), 2011 WL 6747470, at *7 (S.D.N.Y. Sept. 14, 2011) ("a state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence") (internal citations omitted); 28 U.S.C. § 2254(e)(1) (petitioner has burden of "rebutting the presumption of correctness by clear and convincing evidence").  The question for a court reviewing a challenge to a guilty plea in a habeas petition is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the [petitioner]." <u>Hill v. Lockhart</u>, 474 U.S. 52, 56 (1985).  If there is a factual basis in the record on which the court can conclude that the petitioner, advised by counsel, understood the consequences of his plea at the time it was entered, the plea will not be overturned on constitutional grounds.  <u>Brady</u>, 397 U.S. at 756; <u>see</u> B<u>oykin v. Alabama</u>, 395 U.S. 238, 243–44 (1969).

### B.  Analysis of Valdez's Claims

#### 1.  Valdez's challenge to his guilty plea.

In the Petition, Valdez claims that his guilty plea was unlawfully induced and not made voluntarily and knowingly.  (ECF No. 1 at 4).  He claims that the trial court failed to take the "utmost care" and use "simple language" with him, and that he "made several statements during the plea colloquy that either brought into doubt an element of the offense to which he

was pleading or that tended to indicate his plea was not knowing, intelligent, and voluntary."

(Id.)

### a. **Procedural default**

Here, Valdez raised his claim on direct appeal to the First Department (ECF No. 10-2 at 26–35), and in his request for leave to appeal to the Court of Appeals (ECF No. 1 at 2). Ordinarily, this might constitute exhaustion for the purposes of federal court review. See Galdamez, 394 F.3d at 74 ("one complete round" of New York's appellate review process involves an appeal to the Appellate Division and then application to the Court of Appeals for a certificate granting leave to appeal) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). Here, however, the First Department expressly found that Valdez had failed to preserve his challenge to the voluntariness of his plea:

> Defendant's challenge to the voluntariness of his plea is unpreserved (see People v. Conceicao, 26 N.Y.3d 375, 381 [2015]), and we decline to review it in the interest of justice.

Valdez, 138 A.D.3d at 465.

Under New York law, "[g]enerally, in order to preserve a claim that a guilty plea is invalid, a defendant must move to withdraw the plea . . . or else file a motion to vacate the judgment of conviction" under New York Criminal Procedure Law § 440.10. People v. Peque, 22 N.Y.3d 168, 182 (2013). New York courts "have recognized a narrow exception to the preservation requirement, however, where the particular circumstances of a case reveal that a defendant had no actual or practical ability to object to an alleged error in the taking of a plea that was clear from the face of the record." Conceicao, 26 N.Y.3d at 381 (citing People v. Louree, 8 N.Y.3d 541, 546 (2007)).

Here, Valdez neither moved to withdraw his guilty plea nor filed a motion to vacate his conviction under CPL § 440.10.  Valdez argues that his claim is not procedurally barred because it is one of the "exceptional cases in which exorbitant application of [a] generally sound rule renders the state ground inadequate to stop consideration of a federal question."  (ECF No. 26 at 28 (quoting Lee v. Kemna, 534 U.S. 362, 376 (2002)).[3]  Valdez does not contend he is actually innocent and acknowledges that compliance with the state procedural rule would not have changed the outcome before the First Department (see ECF No. 26), which held in the alternative that it would not have vacated the guilty plea even if the claim had been preserved. See Valdez, 138 A.D.3d at 465.  Instead, Valdez argues that "New York case law does not demand compliance with the preservation rule" under the circumstances of his plea in this case.  (ECF No. 26 at 30).  He analogizes his circumstances to those in Conceicao, in which defendants who pleaded guilty and were sentenced immediately thereafter "'faced a practical inability to withdraw their pleas'" such that appellate review was permitted even though they had not made a formal motion to withdraw their pleas.  (Id. at 31–32 (quoting Conceicao, 256 N.Y.3d at 382)).[4]  Here, however, Valdez's sentencing did not immediately follow his plea:  the proceedings were adjourned for almost three weeks between the plea and sentencing, and Valdez offers no cause for why he did not make a motion to withdraw his plea in that period.  Therefore, Conceicao does not provide authority for excusing his procedural default.  Acosta, 326 F. Supp. 2d at 523 (declining to excuse procedural default where defendant failed to demonstrate cause and actual prejudice).

---

[3] Valdez's counsel incorrectly dates the case as 1986, but it was decided in 2002.
[4] Valdez's counsel incorrectly cites pages "128–9."

In addition, Valdez relies on People v. Lopez, 71 N.Y.2d 662 (1988), for the proposition that failure to make a motion to withdraw a guilty plea does not bar appellate review where "a defendant's factual recitation negates an essential element of the crime pleaded to," and the trial court fails to make further inquiry "to ensure that defendant understands the nature of the charge and that the plea is intelligently entered." Id. at 666. (See ECF No. 26 at 32). Valdez further argues that the New York Court of Appeals "expand[ed] the scope of this exception" to apply where a trial judge did not advise a defendant of one of the consequences of pleading guilty during the colloquy. (ECF No. 26 at 33 (citing Louree, 8 N.Y.3d at 546)).

Here, to analyze whether the state procedural default bar applies inexorably requires an analysis of the merits of Valdez's claim: whether his statements negated an essential element of the second-degree murder charge, and whether the trial court's subsequent inquiries were sufficient to ensure that his plea was knowing and voluntary. See Lopez, 71 N.Y.2d at 666. Perhaps perceiving this overlap, Valdez asks in the alternative that the Court stay the Petition to allow him to move in New York State Supreme Court to vacate his conviction under CPL § 440.10. (ECF No. 26 at 36).

Given that the First Department analyzed the merits of Valdez's challenge to his guilty plea notwithstanding his failure to preserve the claim, the Court finds that the most efficient way to proceed involves a similar approach. Even if Valdez's failure to move to withdraw his guilty plea constitutes an independent and adequate state procedural ground that could bar this Court's review of his federal claim, the Court will not dismiss the Petition based on procedural default but instead will proceed to analyze the merits of that claim. See Acosta, 326 F. Supp. 2d at 523–24 (notwithstanding procedural default, analyzing merits of Eighth Amendment claim).

26

###### b. __Voluntariness of guilty plea__

The Court begins with the presumptions that Valdez's plea was voluntary and that the trial court's decision to accept it was correct.  Murray, 2001 WL 26213, at *4 ("A state court's determination of the voluntariness of a defendant's guilty plea is a factual issue that is entitled to a presumption of correctness on habeas review."); 28 U.S.C. § 2254(e)(1).  Valdez's admission of guilt at the plea allocution is given a "strong presumption of verity" and "constitute[s] a formidable barrier in any subsequent collateral proceedings."  Blackledge v. Allison, 431 U.S. 63, 74 (1977); United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").  The petitioner has the burden of "'rebutting the presumption of correctness by clear and convincing evidence.'"  Murray, 2001 WL 26213, at *4 (quoting 28 U.S.C. § 2254(e)(1)); see United States v. Arias, 166 F.3d 1201, 1201 (2d Cir. 1998) (summary order) (requiring defendant to submit "credible reasons" to reject his plea statements).

Valdez argues that he is entitled to habeas relief under section 2254(d)(1) because the First Department unreasonably applied Supreme Court law regarding guilty pleas to the facts. (ECF No. 26 at 41).  Valdez argues that, although the First Department identified the correct governing federal legal principle—whether Valdez's plea was knowing, intelligent, and voluntary—it unreasonably applied that principle when it concluded that there was "nothing to warrant an inquiry into . . . whether [Valdez] waived any potential psychiatric defenses."  (See id. at 42) (quoting Valdez, 138 A.D.3d at 465.)   Valdez contends that the First Department's application of federal law was unreasonable because, although the record demonstrated that his potential affirmative defenses included diminished capacity, mental disease or defect, lack of

intent, and justification, Justice Berkman failed in her obligation to inquire whether Valdez understood that he was waiving his right to assert these defenses at trial.  (Id. at 42–44).

Essentially, Valdez's argument is that because Justice Berkman did not list his potential affirmative defenses and explicitly confirm that he was waiving those defenses by pleading guilty, his plea was not knowing and voluntary.  But, the federal constitutional rule that a plea must be intelligently and voluntarily made does not render a plea "vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision."  Brady, 397 U.S. at 757 (emphasis added).  To the contrary, in reviewing a federal constitutional challenge to a guilty plea, this Court must evaluate the plea "in light of the totality of the circumstances." Murray, 2001 WL 26213, at *4; see Brady, 397 U.S. at 749.

While Valdez is correct that the circumstances relevant to the validity of his plea included the potentially available affirmative defenses, the record reflects that those defenses were adequately covered in the allocution.  Mid-way through the plea hearing, Justice Berkman recessed to allow Valdez to consult with his counsel, after which his counsel represented to the court that he had "explored" with Valdez "all possible defenses and [came] to a conclusion that this is the best resolution of this matter," and Valdez was prepared to proceed to enter his plea to the second degree murder count in the indictment.  (ECF No. 16-6 at 34).  Justice Berkman then confirmed that Valdez did "shoot and kill" the victim, "whatever [his] reasons" were for doing so.  (Id.)  She further confirmed that Valdez had obtained the gun earlier that day for the purpose of shooting the victim.  (Id. at 35).  Then, in response to Valdez's statements that the victim was attacking him and thus the shooting may have been in self-defense, Valdez admitted in response to Justice Berkman's questions that the victim, at most, had his hands up and was

unarmed, a fact that was confirmed by videotape evidence of the incident, and that Valdez then shot him twice.  (Id. at 36–37).  Justice Berkman then confirmed that Valdez "meant to kill" the victim.  (Id. at 39).  She reiterated that in contrast to the maximum sentence of 25 years to life— or possibly life without parole if murder-for-hire had been charged—she was promising him a sentence of 18 years to life, which he acknowledged he understood.  (Id.)  Finally, she listed the trial rights that he was giving up by pleading guilty, including his "right to bring in evidence [on his] own behalf."  (Id. at 40).

The totality of these circumstances demonstrates that before accepting the guilty plea, the trial court conducted the requisite "detailed inquiry" and "ascertained that [Valdez] understood the consequences of the plea and that he wished to plead guilty."  Murray, 2001 WL 26213, at *5.  Equally as important, Valdez was represented by competent counsel, with whom he consulted before and during the colloquy, a fact that "weighs heavily toward a finding of voluntariness."  Id.; see Mabry, 467 U.S. at 508; Brady, 397 U.S. at 756.  Furthermore, Valdez does not allege that his counsel was constitutionally ineffective, or that he was factually innocent.  Murray, 2001 WL 26213, at *5.  While the record does reflect some hesitation by Valdez, a plea entered into with hesitation does not make it involuntary when the totality of the circumstances indicate that the plea was voluntary.  See Brady, 397 U.S. at 749.  Accordingly, Valdez has not demonstrated by clear and convincing evidence that the First Department's decision rejecting his challenge to his guilty plea was contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1), (e)(1).

Valdez also argues that the First Department's finding that the trial court's "clarifying questions" sufficiently ensured that there was no doubt of Valdez's guilt or the voluntariness of

his plea was an unreasonable determination of the facts entitling him to relief under section 2254(d)(2).  (ECF No. 26 at 44–45).  He contends that Justice Berkman, having presided over the 730 Hearings, "was on notice" that Valdez's plea would not be routine and needed to undertake "extraordinary care and prudence," but did not do so.  (Id. at 45).  Instead, he claims, she questioned him "in a highly leading and suggestive manner" designed to "induc[e him] to make specific affirmative statements regardless of their veracity."  (Id. at 45–46).

This argument fares no better than Valdez's argument under section 2254(d)(1).  Again, applying the deferential standard this Court must apply to review a challenge to a guilty plea, the totality of the allocution demonstrates that Justice Berkman took the necessary steps to ensure that Valdez's guilty plea was knowing and voluntary.  The court conducted not one but two 730 Hearings to evaluate fully Valdez's fitness; confirmed that Valdez did shoot the victim—twice— intentionally; recessed the proceedings to give Valdez time to consult with his counsel, who represented that Valdez was aware of his possible defenses and was willing to proceed with his guilty plea; informed Valdez of the rights that he was giving up by pleading guilty; and warned Valdez of the potentially greater sentence if he were to proceed to trial.  (ECF No. 16-6 at 34–39). In addition, it is undisputed that Valdez had entered guilty pleas on at least two prior occasions, and therefore, notwithstanding his intellectual disabilities, was familiar with the significance and consequences of a guilty plea.  (ECF Nos. 16-1 at 52, 54–55; 16-3 at 31–33).  In short, Valdez has failed to point to clear and convincing evidence sufficient to rebut the strong presumption of verity of his guilty plea.  See Blackledge, 431 U.S. at 74.  Accordingly, he has not demonstrated that the First Department's determination that his guilty plea was knowing and voluntary was an

unreasonable determination of the facts as would entitle him to relief under section 2254(d)(2). See Murray, 2001 WL 26213, at *4–5.

       **2.  Valdez's challenge to his sentence**

In his pro se submission in support of his Petition, Valdez argues that his sentence of 18 years to life imprisonment should be reduced in the interest of justice to the statutory minimum of 15 years to life.  (ECF No. 20 at 10–12).  Although Valdez challenged his sentence on his appeal to the First Department and on his request to the Court of Appeals for leave to appeal, his appellate brief presented his claim in terms of state law, invoking the discretionary power of a New York appellate court to reduce his sentence in the interest of justice.  (ECF Nos. 1 at 2; 10-2 at 36–43).  Therefore, to the extent he is now attempting to assert a federal constitutional claim, that claim is "unexhausted because the constitutional dimension of the excessive-sentence claim was not 'fairly presented' to the state courts on direct appeal."  Bell v. Ercole, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) (quoting Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir. 2000)); Acosta, 326 F. Supp. 2d at 521–22.

Even if the Court were to review the merits of his constitutional challenge to his sentence, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).  Valdez's sentence was within the range provided by New York law.  See N.Y. Penal Law §§ 70.00(2)(a), 3(a)(i).  Accordingly, he has not stated a claim for habeas relief based on his sentence.  See Bell, 631 F. Supp. 2d at 419 (finding that sentence that "falls squarely within the applicable range established by the New York legislature" did not provide grounds for habeas relief); Owens v. Conway, No. 10 Civ. 3183 (NRB), 2010 WL 3290980, at *1 (S.D.N.Y. Aug. 11, 2010) (finding that sentence within

the range prescribed by state law was not a valid ground for habeas relief); see also Silvestre v. Capra, No. 15 Civ. 9425 (KPF) (DCF), 2018 WL 3611988, at *2, *33 (S.D.N.Y. July 27, 2018) (adopting magistrate's report and recommendation finding that sentence within state statutory range did not provide a basis for habeas relief).

### IV.   CONCLUSION

For all of the foregoing reasons, I recommend that the Petition be dismissed in its entirety and the request to stay the Petition be denied.

I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), as Valdez has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to Valdez at the address below.

Dated:     New York, New York
           December 20, 2019

_____
SARAH L. CAVE
**United States Magistrate Judge**

Mail to:    Denni Valdez
            Wende Correctional Facility
            P.O. Box 1187
            Alden, NY  14004

*    *    *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Failla.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).  If Valdez does not have access to cases cited in this Report and Recommendation that are reported on Westlaw, he may request copies from Respondent's counsel.  See Local Civ. R. 7.2.